MATTHEW JENNINGS NOLAN, Appellant, v. M. J. FITZPATRICK et al., Appellees.

**VENDOR AND PURCHASER:** Rescission—Deception as to Kind of
1    Land. Purchasers are entitled to rescission of a contract for
the sale of land, where they have not received the kind and
quality of land for which they bargained, even though the land
tendered them is worth all they promised to pay.

**VENDOR AND PURCHASER:** Rescission—Laches. Rescission of
2    the sale of land is not barred by laches because not made for
three years, where the land was in a foreign country, was vacant, unimproved, and not occupied by tenants, and where,
until information came to buyers in a casual way, exciting their
suspicions, there was nothing to suggest the necessity of a
personal investigation into the truth of the matter.

**VENDOR AND PURCHASER:** Remedies of Purchaser—Reliance
3    upon Representations—Caveat Emptor. Where one party undertakes the sale to another of property situated at a distance,
which he has, or claims to have, personal knowledge of, and
of which the buyer knows nothing, except as he is informed by
the seller, the buyer may rightfully rely on the truth of the
representations as to its kind, quality, and value, and, if they
prove to be false, the seller cannot escape responsibility by the
plea that the buyer should not have believed him, or should
have applied to other sources to ascertain the facts. This rule
is not in any manner avoided by the suggestion of the seller
that the buyer go and examine the property, if the property is
situated at such a distance as to discourage or prevent the
buyer's acting thereon; and the buyer cannot be charged with
lack of diligence because he elects to rely upon the word of
the seller.

**CONTRACTS:** Rescission—Fraud—Ratification by Making Payment.
4    There was no ratification of a contract for the sale of land
after the discovery of alleged fraud, by the act of making a

payment thereon by check, after suggestion by someone that it would be well to investigate the matter, when payment was stopped on the check before it was presented for payment at the bank, and where, at the time the matter was under investigation, the land had not yet been visited, or the fact developed that the buyers had been deceived, with such certainty as to satisfy themselves that they had a good defense.

**VENDOR AND PURCHASER:** Rescission—Executory Contract. In an action for rescission of the sale of land on the ground of fraud, where no deed or conveyance of any kind was ever executed or delivered by plaintiff, making it necessary for a reconveyance of title to him, and the payment by plaintiff of the judgment rendered against him will restore all parties to their original status, it is not necessary that the purchasers make formal offer to put the vendor *in statu quo.*

*Appeal from Cerro Gordo District Court.—J. J. CLARK, Judge.*

JULY 10, 1919.

ACTION in equity, to foreclose a contract for the sale of land. The defendants alleged that the contract was procured by fraud and false representations as to the character, quality, and value of the land, for which reason they ask that they have affirmative relief for the rescission of the agreement, and for an assessment of damages in their favor. The trial court dismissed the petition, rescinded the contract, and entered judgment for the defendants for damages in the sum of $1,380.—*Affirmed.*

*Senneff, Bliss, Witwer & Senneff,* for appellant.

*Fitzpatrick & Farmer,* and *Duncan Rule,* for appellees.

WEAVER, J.—At the time of the transaction here in question, the plaintiff, Nolan, was cashier of the People's State Bank of Mason City, Iowa, and was also engaged in the real estate business. In the year 1912, he visited Saskatchewan, Canada, where he purchased, among other

lands, a certain tract of 320 acres, after making personal inspection thereof. In June, 1913, he entered into the contract in suit with the defendants, who were young physicians, engaged together in the practice of their profession at Mason City, and were patrons of the People's Bank, by which he undertook to sell the land to defendants at the price of $8,000, payable $500 within 90 days, and the remainder in annual installments of varying amounts, covering a period of 7 years.

Prior to the beginning of this action, July 21, 1916, defendants had made some payments of principal and interest, but were in arrears to some extent. The controversy before us relates solely to the affirmative defense pleaded by the defendants of fraud and misrepresentation, by which it is alleged they were induced to enter into the contract.

The land in question was at the time, and still is, vacant and uncultivated, and neither of the defendants had seen it, or had any personal knowledge of its situation or value. As witnesses, they testify that, when entering the bank on business, they were frequently spoken to by plaintiff, urging and advising them to buy this land; that he described it as first-class land, as good as there was in Canada, perfectly level, all tillable wheat land, worth $30 an acre, and that every foot of it could be plowed and cultivated; that he said there was no alkali on it, and that he could take a gang plow and go from one corner to the other and plow the whole thing; that he said it was worth $30 an acre, but that he was willing to give defendants the advantage of the extra $5, because he was a friend of theirs, and wanted to see them get started; that he said he had been all over the land, and they could depend on his judgment that the land was first-class; and that it would not be necessary for them to see it,—they could take his word for it. They further testify that they believed and relied on these representations, and in such reliance made

the contract, and had no knowledge or information that the land was not as represented, until within a short time before this suit was begun. Having then heard from some source that the land was not of the quality stated by plaintiff, they went to plaintiff with the story, and he denounced it as false, and repeated his former representations. Later, one of the defendants went to Saskatchewan and examined the land. He says he found 20 acres of it gumbo, a thick, heavy soil without grass on it. It was also cut across by a coulee, or big ravine or ditch, or series of them. They began at the northwest corner of the north quarter, and came down through toward the southwest corner of the half. The coulee ran through the north quarter and part of the south quarter, and spread out in the gumbo tract already mentioned. There was another coulee coming to meet this from the east half, in some places perhaps 50 feet deep. The sides of the coulees were covered with rock and nigger-heads.

"On the north quarter, you could not plow over 20 to 40 acres, and on the south, probably 100 acres. Would say that, all told, there was 30 to 40 acres of alkali. Aside from the alkali spots, the soil was a hard, gravelly mixture."

The witness also produced samples of the soil taken from different parts of the land; also, photographs of some parts of the land surface. This description is corroborated by different witnesses who have seen the land, several of whom live in the vicinity, and appear to be well acquainted with the conditions, and they estimate its value in 1913 at from $8 to $13 per acre. They also express the opinion that, in their judgment, while there are spots or parts of the land which would raise wheat, the half section as a whole is not capable of profitable cultivation.

The plaintiff, as a witness in his own behalf, denies making many of the representations imputed to him, and alleges that he advised defendants to examine the land for

themselves; and in some respects, his testimony is corroborated. He also produces the testimony of various other witnesses, men who have more or less knowledge of this particular land and of other lands in that vicinity, who describe it as being, for the most part, susceptible of cultivation, and worth from $20 to $30 per acre. All admit the existence of the coulees, the gumbo flat, and "burn outs," but not to the extent claimed by the defendants. Their several estimates of the amount of land capable of profitable cultivation vary from 275 acres to 310 acres, and most of them say that, if none of these defects existed, the land would be more desirable and valuable.

The plaintiff's version of the representations made by him is substantially as follows:

"I told them it was a nice piece of land, that there was a little alkali in spots, and told them it could all be cultivated, with the exception of 10 or 12 acres. I told them there was a ravine or draw that went through there and cut off some, but it could be nearly all cultivated but this. I told them it was good wheat land. * * * I never made any representations to them except just as I have said here, that it was a good piece of land, and I had paid $20 an acre for it. I told them about the ravine, and that it was good wheat land,—and it is."

Without questioning the veracity of any of the witnesses, the reading of the entire record leads us quite inevitably to the conclusion that the land, as a whole, is of inferior quality and value, and not what the defendants could reasonably believe it to be, from the representations of the plaintiff. Indeed, it may fairly be said that the witnesses for the plaintiff, including himself, all concede the defects in the land of which defendants complain, but minimize their extent; and the substance of

1. VENDOR AND PURCHASER: rescission: deception as to kind of land.

their opinions, when reduced to brief terms, is that, notwithstanding these defects, the land was still worth what defendants agreed to pay for it. But that is not a sufficient answer to defendants' demand for a rescission of the contract; for they are entitled to receive the kind and quality of land for which they bargained, even though the land tendered them is worth all they promised to pay; and if it be not of that character, they will be excused from performance on their part. See *Rohr v. Shaffer*, 178 Iowa 943, 951.

It is sufficient, upon this feature of the case, to say that we think the trial court justified in finding for defendants upon the charge of misrepresentation. Indeed, while much attention was given and much evidence offered upon this issue in the court below, counsel for appellant, in their argument to this court, base their demand for a reversal upon the proposition that defendants were guilty of laches which will bar their prayer for relief, because they allowed three years to elapse before moving to rescind the contract; and because, before making the contract, they were advised by plaintiff to go and see the land, and neglected so to do, or to make inquiry of others who could have given them information as to its character and quality. While, under ordinary circumstances, failure to demand rescission of a contract on the ground of fraud in obtaining it may often be held laches, barring the right, there is no absolute rule of law or equity which will deny such relief in all cases, because of the mere lapse of time. Whether delay is reasonable or unreasonable depends wholly upon the circumstances attending it. In the case before us, the defendants say and testify that they did not discover and had no reason to believe they had been deceived in the transaction until very shortly before this suit was begun, and they at once instituted investigation into the real char-

2. VENDOR AND PURCHASER: rescission: laches.

acter and quality of the land. The property was situated in a foreign country. It was vacant, unimproved, and not occupied by tenants; and until knowledge or information came to them in a casual way, exciting their suspicion, there was nothing to suggest the necessity or wisdom of a personal examination into the truth of the matter. They are not chargeable with laches simply because they relied upon the representations made to them. We had occasion to consider this question in a case not altogether unlike the one at bar, where the purchaser of Canada land was allowed to rescind after more than two years had passed. See *Rohr v. Shaffer,* 178 Iowa 943; *Barron v. Myers,* 145 Mich. 342 (109 N. W. 862, 863); *Campbell v. Spears,* 120 Iowa 670. In the same case, we said that:

"The rule is sometimes loosely stated in such general terms as to convey the thought that a party to a contract or business transaction must be diligent to discover whether he has been imposed upon by fraud, and that, failing so to act, he waives his right to rescind; but such is not the law. A party dealing with another in good faith has the right, under ordinary circumstances, to assume that the other party has dealt with him in like good faith, until he discovers that he has been made the victim of fraud, or until he has knowledge or notice of facts which should. induce him, as a man of ordinary prudence, to make an investigation which would lead to such discovery." *Rohr v. Shaffer,* 178 Iowa 943, 952.

The only reason suggested by appellant for charging defendants with laches, aside from the mere lapse of time, is that they say in testimony that the first information which aroused their suspicion of having been overreached was a statement by one Button, who did not claim to have any knowledge of that part of Canada, but said something to the effect that it would be well to investigate it. It appears further that, acting on this

suggestion, they gave the matter attention which resulted in their satisfying themselves that they had been misled, and in their refusal to proceed with the contract. There is no laches shown which will operate to bar the defendants' right to relief.

The other point made is, in substance, that the rule of *caveat emptor* is applicable to the transaction; and that, defendants having purchased without visiting and personally inspecting the land, and without making inquiry of others who might possibly have enlightened them with reference to its quality and value, neither law nor equity will now listen to their complaints. The rule of *caveat emptor*, like the rule of sweet charity, has often been invoked to cover a multitude of sins; but we think its protecting mantle has never been stretched to this extent. It can only be applied where it is shown or conceded that the parties to the contract stand on equal footing, and have equal knowledge or equal means of knowledge, and there is no relation of trust or confidence between them. But, where one party undertakes to sell to another property situated at a distance, of which he has or claims to have personal knowledge, and of which the buyer knows nothing, except as he is informed by the seller, the buyer may rightfully rely on the truth of the seller's representations as to its kind, quality, and value, made in the course of negotiation for the purpose of inducing the purchase. If, in such case, the representations prove to be false, neither law nor equity will permit the seller to escape responsibility by the plea that the buyer ought not to have believed him, or ought to have applied to other sources to ascertain the facts. *Sutton v. Greiner,* 177 Iowa 532; *Scott v. Burnight,* 131 Iowa 507; *Hetland v. Bilstad,* 140 Iowa 417; *Holmes v. Rivers,* 145 Iowa 702, 708.

3. VENDOR AND PURCHASER: remedies of purchaser: reliance upon representations.: *caveat emptor.*

Nor is this rule in any manner avoided by the suggestion or advice of the seller that the buyer go and examine the property, if such property be not at hand or easily accessible. If, where that suggestion is given, the property is so distant as to discourage or prevent the buyer's acting thereon, it may well serve as a subtle inducement to accept the truth of the representation made to him. And certainly, even though the advice be given in perfect good faith, the buyer cannot be charged with lack of diligence because he elects to rely upon the word of the seller.

Appellants argue that there was a ratification of the contract after the discovery of the alleged fraud, by the act of one of the defendants in making a payment to the plaintiff. The fact, if we understand the record in relation to the point made, seems to be that, after suspicion that they had been overreached was excited by the suggestion of Button, about two months before this suit was begun, the defendant Echternacht gave plaintiff a check for $90, to apply on this purchase; but before it had been presented to the bank, he stopped payment thereon. At that time, the matter was under investigation by his codefendant, who had not yet visited the land, or developed the fact that they had been deceived, with sufficient certainty to satisfy themselves that they had a good defense. They seem to have acted promptly, and stopped payment of the check; and we think their conduct in this respect does not amount to a ratification. Nor is any ratification pleaded.

4. CONTRACTS: rescission: fraud: ratification by making payment.

It is finally argued that the defendants could not claim a rescission because they did not offer to put the plaintiff *in statu quo*, nor did the court enter any order requiring it.

We do not quite understand the force of this objection. Plaintiff does not point out or suggest what equity required defendants to do, in order to place the parties *in statu quo*. No deed or conveyance of any kind was ever executed or delivered by plaintiff, making it necessary for a reconveyance of title to him. The contract is yet executory, and the affirmance of the decree rescinding it and the payment by plaintiff of the judgment rendered against him will restore all parties to their original status, so far as this property is concerned.

5. VENDOR AND PURCHASER: rescission: executory contract.

The decree appealed from is—*Affirmed.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.